**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURTIS STABILE, | No. 2:22-cv-06776 |
| *Plaintiff*, | (MEF)(SDA) |
| v. | |
| | **OPINION and ORDER** |
| MACY'S, INC., et al., | |
| *Defendants*. | |

**Table of Contents**

I.   Background
     A.   Allegations
     B.   Procedural History
     C.   The Motion
     D.   The Court's Approach
II.  Legal Standards
     A.   Arbitration
     B.   Summary Judgment
III. The Defendants' Argument
IV.  Analysis
     A.   The Agreement
          1.   Meetings
          2.   The Letter
          3.   The Brochure
          4.   The Plan Document
          5.   The Fall 2004 Materials
     B.   Waiver of Rights
     C.   The Defendants' Counterargument

D.    **Next Steps**

**V.    Conclusion**

*    *    *

Claiming discrimination, a former employee sued his ex-employer and an old supervisor.

The employer and the supervisor now move to compel arbitration.

The motion is denied.

*    *    *

**I.    Background**

A.    **Allegations**

The allegations as relevant for now are as follows.

A man[1] worked at a particular retailer ("the Company"[2]) from 2001 to 2021.  See Complaint ¶¶ 10, 45.

At various points during that period, he complained to his supervisor ("the Supervisor"[3]) about assertedly discriminatory Company hiring practices.  See id. at ¶¶ 11-31.  That soured their relationship.  See id. at ¶¶ 30-36.

And then in 2021, an incident took place involving a shoplifter at a Company store.  See id. at ¶¶ 37-40.  The employee was fired for the way he handled it.  See id. at ¶ 41.  But another employee, of a different race, was not fired --- even though the two employees were said to have acted in the same way.  See id. at ¶ 39-42.

B.    **Procedural History**

Citing the above events, the former Company employee sued the Company and the Supervisor, in 2022.

---

[1]  Curtis Stabile.

[2]  Macy's, Inc.

[3]  Felicia Green-Hall.

From here, the former employee is "the Plaintiff," and the Company and the Supervisor are referred to, collectively, as "the Defendants."

The Plaintiff alleged violations of New Jersey's anti-discrimination law, and sued in state court.

The Defendants removed the case to federal court. And in federal court, they moved to compel arbitration.

The Court, per Judge Vazquez, denied the motion without prejudice. In doing so, the Court directed the parties to conduct discovery as to whether a "valid and enforceable" arbitration agreement exists. See Stabile v. Macy's, Inc., 2023 WL 4527129, at *5 (D.N.J. July 13, 2023). And the Court held that any follow-on motion to compel arbitration would be assessed "under a summary judgment standard." Id.

Judge Vazquez retired, and this case was reassigned to the undersigned.

### C.    **The Motion**

Discovery has been completed, and the Defendants have now moved to compel arbitration.

The core argument: during 2003 and 2004, the Plaintiff and the Company agreed that the Plaintiff would arbitrate disputes like this one. See Renewed Motion to Compel Arbitration at 1-2.

The Defendants' motion to compel arbitration is now before the Court.

### D.    **The Court's Approach**

After a brief discussion of the governing legal standards, see Part II, the Court describes more fully the argument that undergirds the Defendants' motion, see Part III, and then analyzes it, see Part IV. The Court's conclusion: the Defendant's argument is not persuasive, and the motion must therefore be denied. See Part V.

## II.    **Legal Standards**

### A.    **Arbitration**

On a motion to compel arbitration, the Court generally takes up two questions.

First, was there was a valid and enforceable agreement?  And second, did the agreement include a commitment to arbitrate whatever dispute is in play?  <u>See</u> <u>generally</u> <u>Century Indem. Co.</u> v. <u>Certain Underwriters at Lloyd's, London, Subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646</u>, 584 F.3d 513, 522-23 (3d Cir. 2009); <u>Flintkote Co.</u> v. <u>Aviva PLC</u>, 769 F.3d 215, 219-20 (3d Cir. 2014); <u>First Liberty Inv. Grp.</u> v. <u>Nicholsberg</u>, 145 F.3d 647, 649-50 (3d Cir. 1998).

If the answers are yes and yes, the dispute must generally be arbitrated.

These two questions focus on bread-and-butter matters of contract formation and contract scope.  They are answered as a matter of state contract law.  <u>See</u> <u>First Options of Chi., Inc.</u> v. <u>Kaplan</u>, 514 U.S. 938, 944 (1995); <u>In re Remicade (Direct Purchaser) Antitr. Litig.</u>, 938 F.3d 515, 520-22 (3d Cir. 2019); <u>Moon</u> v. <u>Breathless, Inc.</u>, 868 F.3d 209, 212-13 (3d Cir. 2017); <u>Aliments Krispy Kernels, Inc.</u> v. <u>Nichols Farms</u>, 851 F.3d 283, 289 (3d Cir. 2017).[4]

Which state's law?

Here, the parties assume that New Jersey's law governs, <u>see</u> Renewed Motion to Compel Arbitration at 21-22; Renewed Brief in Opposition at 8, and so it does.  <u>See</u>, <u>e.g.</u>, <u>Lopez</u> v. <u>Corozal Auto Repair, Inc.</u>, --- F. Supp. 3d. ---, ---, 2024 WL 1930844, at *3 (D.N.J. May 2, 2024) (collecting cases).

Under New Jersey law, a "valid and enforceable" contract has a fixed set of basic ingredients: offer, acceptance, and consideration.  <u>See</u> <u>Goldfarb</u> v. <u>Solimine</u>, 245 N.J. 326, 339 (2021).

---

[4]  The role of federal law in this context is mainly to ensure that the Federal Arbitration Act is followed.  The Act requires that properly-made agreements to arbitrate must indeed be arbitrated.  And it requires that state contract law must be applied only in an appropriate way.  <u>See</u>, <u>e.g.</u>, <u>Viking River Cruises, Inc.</u> v. <u>Moriana</u>, 596 U.S. 639, 650-51 (2022); <u>Kindred Nursing Ctrs. Ltd. P'ship</u> v. <u>Clark</u>, 581 U.S. 246, 254-56 (2017); <u>AT&T Mobility LLC</u> v. <u>Concepcion</u>, 563 U.S. 333, 339 (2011).

Offer is the one that matters here.  New Jersey contract law, as to offer and other topics, is set out as necessary below.

### B.    Summary Judgment

The Defendants' motion to compel arbitration is considered here under a summary judgment standard.  See Stabile, 2023 WL 4527129, at *5.

To be entitled to summary judgment, the Defendants must establish that "[1] there is no genuine dispute as to any material fact and [2] that the[y] . . . [are] entitled to judgment as a matter of law."  Guidotti v. Legal Helpers Debt Resol., LLC, 716 F.3d 764, 772-73, 776 (3d Cir. 2013) (cleaned up); see also Fed. R. Civ. P. 56(a).

### III. The Defendants' Argument

Take up now the argument that the Defendants advance in support of their motion.

During 2003 and 2004, certain information was provided to Company employees as to a mandatory arbitration program.  See Renewed Motion to Compel Arbitration at 5-9.  Employees were invited to opt out of mandatory arbitration --- but, the argument goes, the Plaintiff did not do so.  See id. at 30-32. Therefore, the Defendants say, the Plaintiff is now bound to the Company's offer of mandatory arbitration.  See id. at 36.

What precisely was the Company offer that the Plaintiff assertedly accepted?

Per the Defendants, certain 2003 Company communications, plus the Company's 2004 "plan document," and also some slightly later materials --- all of these are bundled together, and make up the Company's mandatory arbitration offer.  See id. at 23-25.[5]

---

[5]  There might have been other ways forward.  For example, the Defendants might have presented the 2004 plan document as the offer that the Plaintiff accepted.  On that sort of framing, earlier communications from the Company to its employees, from 2003, might have been understood as nothing more than a heads-up --- an announcement that an offer was to come, but not a part of the offer itself.  It is not clear that such a framing would have worked.  But one way or another, the Defendants are the moving parties here, and it is for them to craft the arguments

The Court looks to the various components of the Company's offer in the next Part.

Before doing so, a brief note.

The Defendants argue that the Company's offer was accepted by the Plaintiff because he hung back and did nothing --- through his silence.  See id. at 30-32.  No tweaks to the offer were proposed, no revisions were made.  This means that, per the Defendants, there is no daylight here between (a) the substance of the Company's offer and (b) the substance of the agreement between the Company and the Plaintiff.  The offer and the agreement run together.  Therefore, and solely for present purposes, the Court treats the offer and the agreement as, in substance, the same thing.

## IV.  **Analysis**

This Part analyzes the Defendants' argument.

First, in Part IV.A, the Court assesses the agreement.[6]

The Court's conclusion: the agreement pulls in two opposing directions.  Sometimes it describes mandatory arbitration.  And sometimes it suggests voluntary arbitration --- arbitration that is not required, but that is available if that is what the employee wants.  See Part IV.A.  On the question that matters here --- is a Company employee obligated to arbitrate? --- the agreement either contradicts itself or is at least badly muddled.

Second, in Part IV.B, the Court concludes that such an agreement does not meet the standards for clarity that apply under New Jersey law when a contract is said to require that a person (here, the Plaintiff) give up a statutory right (here, the right to go to court and sue, instead of being obligated to arbitrate).

Therefore, the Defendants have not shown that they are entitled to judgment as a matter of law.  See Guidotti, 716 F.3d at 772-

---

they want to push forward.  See United States v. Sineneng-Smith, 590 U.S. 371, 374-75 (2020).  The Court is required to follow the Defendants' lead, see id., and does so here.

[6]  As noted just above, the 2003-2004 Company offer is substantively identical to the asserted Company/Plaintiff agreement.

73; Fed. R. Civ. P. 56(a).  They have not shown that the agreement requires what their motion needs it to --- mandatory arbitration.

<u>Third</u>, in a brief Part IV.C, the Court addresses, and turns aside, the Defendants' main counterargument --- which rests on a set of cases that are not on point, in part because they consider Company arbitration agreements that meaningfully differ from the one here.

### A.    <u>The Agreement</u>

Start the analysis by zeroing in on each of the component parts of the asserted agreement between the Company and the Plaintiff.[7]

### 1.    <u>Meetings</u>

The first piece of the Company's offer, <u>see</u> Renewed Motion to Compel Arbitration at 23-25, came via a set of meetings for Company employees; these were held during the late summer and early fall of 2003, when the Plaintiff worked for the Company.[8]

The proof put before the Court is that the same video was shown at each meeting.  <u>See</u> Declaration of Cynthia Ripak in Support of Defendants' Motion to Compel Arbitration ("Ripak Declaration") ¶ 18.  And a transcript of the video is in evidence.[9]

Per the transcript, the employees were told about a three-step process for informally resolving employee grievances within the

---

[7]  Recall two things.  First, the Defendants framed the Company's offer in a particular way, and the Court, as required, follows along.  <u>See</u> footnote 5.  And second, on the argument pressed here by the Defendants --- there is no difference between the substance of the Company's offer and the substance of the Company/Plaintiff agreement.  The stuff of the offer is the stuff of the agreement.  For ease of reference, "the offer" is sometimes used in this Part, and sometimes "the agreement."  But they amount to the same thing.

[8]  Systematic efforts were apparently made by the Company to get employees to attend these meetings.  <u>See</u> Ripak Declaration ¶¶ 16-17 ("[The Company] directed that all employees be required to attend one of the information meetings and that the information be forwarded to any employee who was unable to attend[.]").

[9]  The video transcript is Exhibit D to the Ripak Declaration.

Company.  And they were also told about a fourth step.  The full
passage on arbitration:

> NARRATOR: We're very confident of the Solutions InSTORE
> program and expect most people who use it will reach a
> successful resolution by this point in the process.
> However, if you're not satisfied, you can take advantage of
> the final and most formal level of Solutions InSTORE called
> arbitration.  This gives you access to a member of the
> American Arbitration Association, a nonprofit neutral
> organization specializing in helping people resolve
> disputes quickly and fairly.  Your arbitrator acts much
> like a judge, that is, listening to each side, reviewing
> evidence, and making a decision that's final and binding
> for everyone.  And just like a courtroom judge, the
> arbitrator can award monetary damages, including punitive
> damages or reinstatement.  Decisions are final and binding
> for both sides.

Video Transcript at 7:23-8:12.

This does not imply that an employee like the Plaintiff might be
<u>required</u> to arbitrate his claims.  Only that the employee could
<u>choose</u> to arbitrate his claims.

Arbitration happens "if" something else happens --- not always,
not across-the-board.

And arbitration goes forward "if you're not satisfied."
Arbitration is triggered by the "not satisfied" employee's
wishes, not against those wishes --- as mandatory arbitration
might sometimes need to be, and as it would be here.

And what (little) else is said about arbitration in the video
suggests the same point.  In the above-quoted passage,
arbitration is presented as a lever that is the employee's to
pull.  "You" --- the employee --- "can take advantage" of
arbitration.  And the "advantage" is presented as an option, not
an obligation.  It "can" be "take[n] advantage" of --- which
means it need not to be taken advantage of.  And who chooses
whether to go down the road of arbitration?  Not the Company,
but the employee: "you."

Bottom line: the video, which the Defendants describe as part of
the offer, see Renewed Motion to Compel Arbitration at 23-25,
does not suggest that the Company offered compulsory
arbitration.  Instead, the video can be read to suggest that

arbitration was voluntary --- and that the choice of whether to arbitrate was the employee's.

## 2.   The Letter

Look now to a second component of the Company's offer, as the Company's legal briefs describe it.   See id.

This was a letter to employees from the Company's Chairman and Chief Executive Officer.   See id.[10]   The letter was apparently sent in 2003, see Ripak Declaration ¶ 17, and was packaged with certain other materials, see id., of which more soon.

The letter, in relevant part:

> What makes **Solutions InSTORE** so outstanding is its emphasis on early resolution.   By addressing problems early, the program helps us preserve our work relationships.   You will find the program is fair, quick, confidential and, of course, free of retaliation.   And, *you* drive the process. The Company agrees to abide by the decision at any level of the program.   Only you can determine if you would like your situation to receive further review.

> With **Solutions InSTORE,** you are even eligible for the same types of awards that are available in the more traditional court of law --- so there's everything to gain and nothing to lose.

Recall, see Part IV.A.1, that the Company's dispute-resolution process worked like a four-rung ladder.   Climb the first three rungs --- and then arbitration.

The Company's video suggested that the decision to go up to the top level, to arbitration, was a voluntary choice that belonged to the employee.

And against that backdrop, the CEO's letter implied more of the same: "you," the employee "drive the process;" "[o]nly you can determine if you would like your situation to receive further review."

Who decides whether to go to arbitration ("further review")? The employee alone ("[o]nly you").

---

[10]   The letter is Exhibit C to the Ripak Declaration.

That does not sound like mandatory arbitration imposed on an employee.  It sounds, if anything, like arbitration at the employee's choice.[11]

### 3.    **The Brochure**

Focus here on the third component of the Company's offer.  <u>See</u> Renewed Motion to Compel Arbitration at 23-25.

This part of the offer was meatier than the prior two.  It was reflected in a 12-page brochure.[12]  The brochure was from 2003. <u>See</u> Ripak Declaration ¶¶ 15-17.

The first mention of arbitration is on page two of the brochure. It depicts the Company's proposed four-step dispute-resolution process as a pyramid, with arbitration as the capstone, sitting on top.

There is no suggestion in the brochure that arbitration is mandatory.  Rather, arbitration is presented as the employee's choice.

> If you take your dispute all the way to Step 4, you and the Company are bound by the decision of the independent arbitrator.

Brochure at 2.

Who chooses to go to arbitration ("Step 4")?  The employee ("you").

The next page of the brochure runs along similar lines.

> Solutions InSTORE offers you multiple opportunities to have your dispute heard by a third party --- some are close to your situation and others are more removed.  You decide whether to accept the outcome of each step or move to the

---

[11]  Like the video, the CEO's letter framed arbitration as an additive option, to be pulled off the shelf and used to the extent an employee wanted.  Perhaps especially in light of that framing, it made sense to present arbitration as a pure win-win for the employee --- "there's everything to gain and nothing to lose."  A new option (arbitration) was gained, but nothing was lost (because arbitration displaced going to court only if the employee wanted it to).

[12]  The Brochure is Exhibit B to the Ripak Declaration.

next one --- as long as it's appropriate for your type of dispute.

Id. at 3.

Arbitration is a "step," the fourth one.  Who "decide[s] whether to . . . move to [it]"?  Again: "you," the employee.  That sounds like arbitration at the employee's choice, with no hint of mandatory arbitration.

Pages nine and ten of the brochure hone in more closely on arbitration.  Some excerpts:

> If you are not satisfied with the results of Step 3, you may proceed to Step 4 --- Arbitration, a process outside of and independent from the Company.

Id. at 9.

> How arbitration works: . . . You make a written request for arbitration to the Office of Solutions InSTORE within 30 days of Step 3 decision.

Id.

None of this casts arbitration as a required track.  Arbitration is not a place the employee must go.  It is, rather, a place the employee "may proceed to."  Who chooses if arbitration is the ultimate destination?  "[Y]ou," the employee --- "[i]f you are not satisfied," and based on an employee-initiated written request.  That is "[h]ow arbitration works."

In short: the brochure presents the whether-to-arbitrate decision as a fork in the road --- with the employee the one to choose which way to go.  There is no suggestion that arbitration is mandated --- the only way forward, regardless of what the employee might later want.

The brochure ends by noting that more detailed information is on the way, and that the coming information would flesh things out.

> More specific details are in the program's Plan Document which governs Plan administration.  This Plan Document will be sent to eligible employees at their home addresses.

Id. at 11.

### 4. __The Plan Document__

Come now to the fourth component of the Company's offer.  <u>See</u> Renewed Motion to Compel Arbitration at 23-25.

This was the January 1, 2004, "plan document" the Company mailed to employees' homes.[13]

At its outset, the plan document seems to pick up where the brochure left off.

The first two pages of the plan document use the same pyramid graphic as the brochure.  <u>See</u> Plan Document at 1-2.

And those first two pages of the plan document sound the same note as the brochure --- as to arbitration, the employee chooses.  Per page two of the plan document: "In the rare situations that, for whatever reason, your dispute cannot be resolved internally . . . [y]ou can request Arbitration."  <u>Id</u>. at 2.

In addition, there was an "election form" attached to the back of the plan document.[14]  The election form presented the plan document as yoked to the previous information the Company had provided --- with the plan document elaborating on what Company employees had been told before.

> Over the last several weeks, you have been learning a lot about our new early dispute resolution program, Solutions InSTORE. . . . In this packet, you will find a Plan Document which is a more comprehensive description of the Solutions InSTORE program.

The upshot: the plan document's bookends, front and back, suggested that the plan document sitting between them was more of the same, that it was in keeping with what Company employees had previously been told.  And given what had come before --- the video, <u>see</u> Part IV.A.1, the letter, <u>see</u> Part IV.A.2, and the brochure, <u>see</u> Part IV.A.3 --- the plan document could be expected to focus on voluntary arbitration at the employee's choice, not mandatory arbitration.

---

[13]  The plan document is Exhibit A to the Ripak Declaration.

[14]  The election form is Exhibit F to the Ripak Declaration.

But that was not to be.  The plan document painted a different picture:

> Except as otherwise limited, all employment-related legal disputes, controversies or claims arising out of, or relating to, employment or cessation of employment shall be settled exclusively by final and binding arbitration administered by the American Arbitration Association[.]

Plan Document at 5.

This describes mandatory arbitration --- clearly and plainly, without ifs ands or buts.  Other nearby paragraphs of the plan document point in the same required-arbitration direction, and again with no ambiguity.  See id. at 5-7.

### 5.    __The Fall 2004 Materials__

Take here the fifth and final piece of the Company's offer, as described in its legal briefs.  See Renewed Motion to Compel Arbitration at 23-25.

These were materials sent to Company employees who did not check the opt-out box on the election form that came with the plan document.  See Ripak Declaration ¶¶ 37-40; see also Ripak Declaration, Exhibit G; Exhibits L-N.  These materials were apparently mailed around October 2004, and gave employees another chance to say no to arbitration.  See Ripak Declaration ¶¶ 37-39.

These materials described the arbitration process, see, e.g., Ripak Declaration Exhibit L; Exhibit M, but they said nothing explicit as to arbitration being mandatory.[15]

-----

[15]  The materials included a letter from the Company CEO. Discussing the Company's newly rolled-out dispute-resolution program, the letter said that "you, the [employees], are in control of the process."  Ripak Declaration, Exhibit M.  Looking back over the program, the CEO wrote that "[a]ssociates tell us they appreciate being the one driving the process, deciding whether their situation should receive further review."  Id. Some of this might suggest that arbitration is the employee's choice.  The employee is in "control," in the "driv[er's]" seat, making the "deci[sions]."  Other parts of the fall 2004 materials can be read in the same way.  See Ripak Declaration, Exhibit L, at 4 (describing "[t]aking your claim to arbitration"

*    *    *

A review of where things stand.

The question that matters here is whether the Company's offer (which is indistinguishable from the Company/Plaintiff agreement, <u>see</u> footnote 7), required arbitration.

But the offer/agreement does not hang together.

Some parts of it suggested that arbitration was at the employee's choice.  These parts were the video, the letter, and the brochure.

And another part of the offer/agreement, the plan document, said that arbitration was mandatory.  But even that clear signal blurs at the edges into noise, with the confusing suggestion that the plan document (which says arbitration is mandatory) merely fleshes out prior communications (which imply arbitration is not mandatory).

Bottom line: the agreement, assuming for present purposes there was one, was deeply confused or even internally contradictory on the key question here, of whether arbitration was or was not mandatory.

**B.   <u>Waiver of Rights</u>**

Often enough, the basic purpose of a contract is to allow someone to credibly commit to give something up.

In an employment contract, for example, a person might agree to part with some of their time in exchange for money.  Or a manufacturer might agree to give up steel, or a utility to give up a supply of electricity --- all in return for some cash.

Sometimes, contracts envision giving up statutorily-created rights.  Such contracts can raise distinct legal issues, both substantively and procedurally.

A substantive example: under federal law, some statutory rights can be given up by a contract, but not others.  <u>See</u>, <u>e.g.</u>, <u>Eisenberg</u> v. <u>Advance Relocation & Storage, Inc.</u>, 237 F.3d 111, 117 (2d Cir. 2000) (contrasting statutory intellectual property

---

--- but not discussing the Company taking employees' claims to arbitration).

rights, which can be contracted away, with anti-discrimination rights, which cannot).

And a procedural example: under New Jersey law, some statutorily-created rights can be contracted away --- but only if certain especially-exacting standards are met. See W. Jersey Title & Guar. Co. v. Indus. Tr. Co., 27 N.J. 144, 152-53 (1958); Country Chevrolet, Inc. v. N. Brunswick Twp. Plan. Bd., 190 N.J. Super. 376, 380 (1983).[16]

New Jersey's unusually rigorous standards apply in the mandatory arbitration context. See Atalese v. U.S. Legal Servs. Grp. L.P., 219 N.J. 430, 443-44 (2014).[17]

As the New Jersey Supreme Court has explained:

> An arbitration agreement must be the result of the parties' mutual assent, according to customary principles of state contract law. Thus, there must be a meeting of the minds for an agreement to exist before enforcement is considered.
>
> For any waiver-of-rights provision to be effective, the party who gives up rights must have full knowledge of his legal rights and intent to surrender those rights. . . . Our jurisprudence has stressed that when a contract contains a waiver of rights --- whether in an arbitration or other clause --- the waiver must be clearly and unmistakably established. . . .

---

[16] And note that in a number of contexts, federal law also requires special procedural care before certain rights are given up. Waivers of some constitutional rights, for example, must be knowing and intelligent, see, e.g., Edwards v. Arizona, 451 U.S. 477, 482 (1981), and some non-constitutional rights, too. See, e.g., Int'l Bhd. of Elec. Workers, Local 803, AFL-CIO v. NLRB, 826 F.2d 1283, 1287 (3d Cir. 1987). Especially when seen against this backdrop, it is not clear that New Jersey's approach is outlying. As will be noted in a moment in the text, New Jersey requires special clarity of expression as to purported waivers of statutory rights, to ensure that the underlying waivers themselves are "clear[] and unmistakabl[e]."

[17] A person who agrees to compulsory arbitration is letting go of a statutorily-created right they would otherwise have --- the right to sue. See Atalese, 219 N.J. at 442-43.

> [A] waiver-of-rights provision [must] be written clearly
> and unambiguously.

Skuse v. Pfizer, Inc., 244 N.J. 30, 48-49 (2020) (cleaned up);
accord, e.g., Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 138-
39 (2020).

The Defendants are not entitled to summary judgment here
because, at least for now, the above standards have not been
met.

*    *    *

The issue in play here is whether the contract[18] requires
mandatory arbitration.  But while some parts of the contract say
"yes," see Part IV.A.4, others suggest the opposite, see
Part IV.A.1-3; cf. Part IV.A.5.

Such a contract is not, in relevant part, "clear[] and
unambiguous[]."  Skuse, 244 N.J. at 49-50.  And that means that
an employee who accepted the contract, as the Plaintiff is
alleged to have done here, cannot, without more, be taken to
have "clearly and unmistakably," id. at 49, given up his right
to sue.

Coming to such a conclusion would amount to ignoring parts of
the contract --- those parts, see Part IV.A.1-3, that imply that
Company employees were not giving up their right to sue, but
rather were gaining a right to arbitrate, to be exercised at
their discretion.[19]

---

[18]  See footnote 7.

[19]  A slightly different way to understand the same point:

> [W]hen determining whether to enforce an arbitration
> agreement, a court's initial inquiry must be -- just as it
> is for any other contract -- whether the agreement to
> arbitrate all, or any portion, of a dispute is the product
> of mutual assent, as determined under customary principles
> of contract law.  Mutual assent requires that the parties
> have an understanding of the terms to which they have
> agreed.  A legally enforceable agreement requires a meeting
> of the minds.

Arafa v. Health Express Corp., 243 N.J. 147, 171 (2020) (cleaned
up).  But the record as developed to this point does not suggest
such a meeting of the minds.  The offer here, see Renewed Motion

To see the point in sharper relief, look to the New Jersey
Supreme Court's decision in <u>Kernahan</u> v. <u>Home Warranty Adm'r of
Fla., Inc.</u>, 236 N.J. 301 (2019).

There, the Supreme Court held that arbitration could not be
imposed because the contract "addressed two different methods of
alternative dispute resolution --- arbitration and mediation ---
in a contradictory and confusing manner[.]"  <u>Skuse</u>, 244 N.J. at
49 (describing <u>Kernahan</u>).

So too here.

The asserted agreement suggests two ways to resolve disputes ---
mandatory arbitration and at-the-employee's-option arbitration.
This is "contradictory and confusing."  <u>Id</u>. at 49 (describing
<u>Kernahan</u>).  As in <u>Kernahan</u>, the various "material discrepancies"
in the agreement "cannot be harmonized."  <u>Kernahan</u>, 236 N.J. at
326-27.

Moreover, in <u>Kernahan</u> the New Jersey Supreme Court emphasized a
set of things that made the relevant offer too unclear to
support a meeting of the minds.  These included "small typeface,
confusing sentence order, and [a] misleading caption," all of
which "exacerbate[d] the lack of clarity in expression."  <u>Id</u>. at
326.

These are potentially fixable.  A small font can be squinted at,
and hard-to-follow syntax can be read very slowly --- and all of
that can at least sometimes yield up a clarified meaning.

But in this case, the difficulty is not a visual or linguistic
lack of surface clarity.  It runs deeper.  The difficulty is the
underlying substance itself --- the tension between the parts of
the asserted contract.[20]

---

to Compel Arbitration at 23–25, seems to have proposed two
different things, mandatory arbitration and arbitration at the
employee's option.  <u>See</u> Part IV.A.  The Defendants say that
minds came together on one of these, mandatory arbitration.  <u>See</u>
Renewed Motion to Compel Arbitration at 30-32.  But how to know?
Certainly not from the Plaintiff's asserted assent.  That assent
was said to have been made through silence.  And silence does
not clarify which piece of an offer is or is not being accepted.

[20]  Those parts are not, in and of themselves, especially
unclear.  The brochure, for example, is plain-spoken, and also

The flavor of one part (arbitration is not required) is at odds with another part (arbitration is required).  And that dissonance generates at least as much in the way of "misleading . . . lack of clarity" as a small typeface or confusing sentence order.[21]

In short: the agreement here is at least as "confusing" and "misleading" as another agreement that was rejected by the New Jersey Supreme Court as not clear enough to pass muster.  See id.  The "material discrepancies" here, id., between mandatory and voluntary arbitration, preclude entry of summary judgment on behalf of the Defendants.[22]

---

user-friendly --- it is buttressed by photographs and helpful graphics.

[21] There may be an extra dollop of confusion here, too.  The contract, see footnote 7, says that its various pieces fit together.  See Part IV.A.3 (noting that the brochure was described as a summary of the plan document); see also Part IV.A.4 (noting that the plan document election form characterized the plan document as "a more comprehensive description" of previous materials).  These implicit invitations to puzzle through, to try to harmonize discordant contractual notes, could at least potentially spin off more lack of clarity.

[22]  Two points.  First, there may be another issue.  Under New Jersey law, contractual terms that are "buried," that are "proffered . . . with a design to conceal or de-emphasize [the relevant] provisions" --- these can be non-binding as a matter of law.  Noble v. Samsung Elecs. Am., Inc. 682 F. App'x 113, 116 (3rd Cir. 2017) (applying New Jersey law) (cleaned up).  That can be a concern at a single moment in time, as when a book is different than its cover.  See id. (holding that when the cover says "manual," but its contents include a purported contract --- the contract is not enforceable as a matter of New Jersey law).  And it would seem to also be a possible concern across moments in time --- as when a Time 1 part of the offer "de-emphasize[s]," id., any need to look at the Time 2 part of the offer.  That Time 1/Time 2 dynamic would appear to be a possible aspect, perhaps entirely inadvertent, of the "design" of the Company's communications here with its employees.  At Time 1, a user-friendly Company brochure suggested that arbitration was voluntary, and presented itself as a "summary" of the plan document that would be mailed off to employees at Time 2.  This suggested that what was to come at Time 2 would largely be more of the same.  Cf. footnote 21.  Would an employee who at Time 1

### C.    **The Defendants' Counterargument**

Against the conclusion set out above, the Defendants cite a number of cases that are said to go the other way.  <u>See</u> Renewed Motion to Compel Arbitration at 22, n.2.

---

read the "summary" have been induced to ignore the (denser and more lawyerly) materials when they arrived at Time 2?  <u>See</u> <u>generally</u> <u>Hoffman</u> v. <u>Supplements Togo Mgmt., LLC</u>, 419 N.J. Super. 596, 606-12 (invoking "fundamental precepts of contract law" to hold a term unenforceable when a party is not "fairly informed of the contract's terms" because the term "was unreasonably masked from . . . view" by "its circuitous mode of presentation").  This question might potentially be suggested by the record here.  But given the disposition of the Defendants' motion, it does not need to be taken up now.

A <u>second</u> point.  Neither party argues that federal law, <u>see</u>, <u>e.g.</u>, <u>Kindred Nursing Ctrs. Ltd. P'ship</u>, 581 U.S. at 254-56, displaces the relevant New Jersey interpretive principle --- which, as noted, requires special clarity for contracts that purport to give up statutory rights, including the right to go to trial.  Maybe the parties view a preemption argument as weak, in part because this New Jersey interpretive principle does not seem particular to arbitration.  <u>See</u> Atalese, 219 N.J. at 443 (making this point and citing numerous cases); <u>cf</u>. footnote 16. Or maybe the parties believe that even under the most generic principles of New Jersey contract law, it would be hard to conclude there has been a meeting of the minds as a matter of law as to one contract provision (mandatory arbitration), where the contract might well be taken to contain the opposite provision (permissive arbitration).  <u>See</u> <u>Limogiannis</u> v. <u>Consumers Distrib. Co.</u>, 215 N.J. Super. 50, 53 (App. Div. 1986); <u>Rockel</u> v. <u>Cherry Hill Dodge</u>, 368 N.J. Super. 577, 581 (App. Div. 2004); <u>see</u> <u>also</u> <u>5907 Blvd. LLC</u> V. <u>W.N.Y. Suites, LLC</u>, 2013 WL 3762695, at *4 (App. Div. Jul. 19, 2013).  (And if clarity cannot be obtained through other means, like a resort to extrinsic evidence, then it would seem possible that the asserted agreement might need to be construed against the drafter, the Company --- and that would appear to weigh in favor of permissive arbitration, not mandatory.  <u>See</u> <u>generally</u> <u>Roach</u> <u>v. BM Motoring, LLC</u>, 228 N.J. 163, 174 (2017).)  One way or another, though: no preemption argument has been raised here, and the Court is unaware of any obligation to raise it <u>sua</u> <u>sponte</u>.

But most of these cases were decided on other grounds. See, e.g., Mount v. Macy's Retail Holding, Inc., 2013 U.S. Dist. LEXIS 189793, at *11-13 (D.N.J. Jan. 8, 2013) (considering only the question of consideration); see also Johnmohammadi v. Bloomingdale's, Inc., 755 F.3d 1072, 1076–77 (9th Cir. 2014); Quevedo v. Macy's, Inc., 798 F. Supp. 2d 1122, 1133-34 (C.D. Cal. 2011); Barrasso v. Macy's Retail Holdings, Inc., 2016 WL 1449567, at *5 (D. Mass. Apr. 12, 2016); Feroce v. Bloomingdale's, Inc., 2014 WL 294199, at *5-6 (E.D.N.Y. Jan. 24, 2014); cf. Allen v. Bloomingdale's, Inc., 225 F. Supp. 3d 254, 258-60 (D.N.J. 2016) (focusing mainly on whether Company materials were explicit about a jury trial waiver --- an issue not taken up here).

Other cases analyze the plan document but not the brochure, see, e.g., Rupert v. Macy's, Inc., 2010 WL 2232305, at *6 (N.D. Ohio June 2, 2010), or treat the brochure in only glancing fashion. See Jayasundera v. Macy's Logistics & Ops., 2015 WL 4623508 (D.N.J. Aug. 3, 2015); Nguyen v. Federated Dep't Stores, Inc., 2005 U.S. Dist. LEXIS 39642, at *10-12.[23]

The Defendants' most on-point case seems to be Tillman v. Macy's, Inc., 735 F.3d 453 (6th Cir. 2013). There, the plaintiff argued that the materials the Company had provided to him did not add up to an offer to engage in mandatory arbitration. See id. at 456. The Sixth Circuit disagreed and held that those materials were "sufficient to constitute a valid offer." Id. at 459.

But on a harder look, the similarity between this case and Tillman dissipates. Here, the Plaintiff received a 2003 brochure. In Tillman, the plaintiff received a 2006 brochure. See id. at 455. It had apparently been revised, to leave no

---

[23] It is not clear how those cases were argued by the parties. For example, how was the brochure brought up? Did the Company, as here, press the argument that the plan document and the brochure were part of a single overarching offer? And it is also not clear how the courts in question might have received such arguments if they had been presented. See, e.g., Com. of Pa. v. Brown, 373 F.2d 771, 784 (3d Cir. 1967) ("[I]t is universally recognized that '[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'") (quoting Webster v. Fall, 266 U.S. 507, 511 (1925)).

room for doubt about arbitration's mandatory nature.  Per the 2006 brochure, arbitration was to be "the sole and exclusive means to resolving any [employment] dispute."  Id. at 457 (quoting the 2006 brochure).  But that is a long way from the 2003 brochure quoted above, see Part IV.A.3 --- which suggests arbitration at the employee's choice, not mandatory.[24]

### D.  **Next Steps**

To this point, the Court has concluded that the Defendants are not entitled to judgment as a matter of law, see Guidotti, 716 F.3d at 772-73; Fed. R. Civ. P. 56(a), because they have not shown there was a sufficiently solid agreement between the Plaintiff and the Company as to mandatory arbitration.

From here, there are any number of possible ways forward.

One approach might be to allow for some tightly-targeted discovery under the supervision of the United States Magistrate Judge --- as to extrinsic evidence that might at least potentially shed light on the meaning of the agreement.  See generally Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238-39 (2008); Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 (2016); Cypress Point Condo. Ass'n, Inc. v. Adria Towers, LLC, 226 N.J. 403, 415-16 (2016); Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269-70 (2006) Kearny PBA Loc. No. 21 v. Town of Kearny, 81 N.J. 208, 221 (1979); Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 302 (1953).

Whether proceeding this way makes sense is not obvious, and all the more so given that there are other open questions here that could at least potentially call for a summary trial under Section Four of the Federal Arbitration Act.

The Court will enter an order today, to get the parties' views on next steps.

---

[24]  Other cases cited by the Defendants also seem to reason from a post-2003 Company brochure.  See Narez v. Macy's W. Stores, Inc., 2016 WL 4045376, at *3-4 (N.D. Cal. July 28, 2016) (quoting from a 2009 brochure); Sellers v. Macy's Retail Holdings, Inc., 2014 WL 2826119, at *1, *4 (W.D. Tenn. June 23, 2014) (citing a brochure provided around 2009).

## V.    Conclusion

The motion to stay this lawsuit and to compel arbitration is denied.

IT IS on this 27th day of September, 2024 so **ORDERED**.

_____

Michael E. Farbiarz, U.S.D.J.